UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Mayville Holdings, LLC,                    Case No. 23-24460-beh

            Debtor in possession.          Chapter 11

## DECISION AND ORDER ON DEBTOR'S OBJECTION TO OLD NATIONAL BANK'S CLAIM

Debtor Mayville Holdings, LLC, filed a Chapter 11 bankruptcy petition on September 30, 2023. It seeks to reorganize and continue as an operating concern. Its primary creditor, Old National Bank, filed a claim for $5,469,741.09, asserting that the entire amount is secured by a mortgage and security interest in the debtor's real and personal property, which the bank values at over $6,000,000. The debtor objected to the bank's claim, contending that only a portion of the claim is secured and asking the Court to determine the value of the secured portion under 11 U.S.C. § 506(a) for purposes of treatment in its Chapter 11 plan. The debtor values the secured portion of the claim at $2,550,000.

The Court held an evidentiary hearing on May 9, 2024. Based on the record, the Court makes the following findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

### FACTS

The debtor operates an assisted living facility d/b/a Prairie Ridge Assisted Living. The facility is located at 1175 Breckenridge Street in Mayville, Dodge County, Wisconsin. It consists of a large building, a parking lot, and various landscaping. The building was constructed in 2017 and 2018, at a reported budget of just over $7 million. The facility contains 37 one-bedroom units, with an average size of 650 square feet. The gross building area is

39,347 square feet, of which 24,050 square feet is net rentable area. The facility sits on a 6.624 acre lot.

The debtor asserts that the value of the Mayville property is $2,550,000, while Old National Bank contends that the value is $6,080,000. Both parties offered expert testimony in support of their respective positions. The Mayville director of admissions and marketing also offered testimony.

## A. Testimony of Gary DeClark

The debtor presented an expert report and testimony from Gary DeClark. Mr. DeClark has been the senior managing director and principal of Valbridge Property Advisors in Chicago since 2017. Prior to that, he was the Senior Vice President of CBRE, Inc. from 2014–2017, and from 1999–2014, he was the Managing Director of Integra Realty Resources in Chicago.

Mr. DeClark has a bachelor's degree in finance, and a Master of Arts in real estate and urban development. He obtained his MAI (Member Appraisal Institute) designation from the Appraisal Institute in 1981 and holds a CRE (Counselor of Real Estate) designation.

Mr. DeClark's duties as senior managing director of Valbridge include valuation, promotion, and review, as well as some testimony work. He testified that over the course of his 40+ years in the valuation industry, he has performed valuations on many assisted living facilities, nursing homes, and independent living facilities.

Mr. DeClark prepared his report in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). The Court finds Mr. DeClark to be well-credentialed, experienced, and qualified to opine on the value of the Mayville facility.

Mr. DeClark visited the Mayville facility in November 2023 as part of his appraisal and prepared his report as of that date. His overall value estimate for the property was $2,550,000, or $68,919 per unit.

1.    **Market Analysis**

Mr. DeClark described Mayville as a semi-rural community in the middle of Wisconsin. He testified that the debtor's property is located in the north-northwest sector of Mayville. Breckenridge is an east–west street, asphalt-paved with curbs and gutters. Also, to the north-northwest is an aquatic facility called the TAG Center. Other properties nearby include single-family residential properties as well as condominium properties to the west, south, and east. The facility is on the of edge of the municipality, and there are large areas to the north of the property that are farmland under crop.

In conducting his appraisal, Mr. DeClark looked at demographics and activity on a regional, semi-regional, and neighborhood level. Regionally, the property is located in Dodge County, centrally located between Milwaukee, Fond du Lac, and Madison. It is not a large-scale urban area, like Milwaukee. According to the statistics reviewed by DeClark, the population in Mayville has decreased between 2020 and 2023, and the populations of both Mayville and Dodge County are expected to decrease through 2028. From an income standpoint, the median, average, and per capita household income in Mayville is less than that of Dodge County, Wisconsin, and the United States.

On a neighborhood level, Mr. DeClark looked at statistics of the population within a one-mile, three-mile, and five-mile radius of the property. The overall population has declined from 2020 to 2023 and is forecast to continue declining through 2028. The income levels for residents within a one-mile radius of the facility is also less than those within the three-mile and five-mile radii.

Mr. DeClark next considered the senior housing market specifically. He noted that interest rates have increased over recent months, a trend he expects to continue, based on reports from the Federal Reserve. At the same time, there

has been a historical drop in CPI (Consumer Price Index). In roughly 2022, the CPI was 9.1%, while in 2023, it decreased to about 3%, suggesting that costs of everyday goods are not moving up at the rates seen in the past.

Mr. DeClark believes the tentative nature of the senior housing market will have a suppressing effect on things going forward. High interest rates may cause investors to be more cautious, and in this particular case, it may mean elderly people wait longer to sell their houses and/or move into an assisted living facility. While there will be an increase in demand due to an aging Baby Boomer population, he questions at what economic level, and whether that demand may be offset by high interest rates or CPI. DeClark described the outlook for long-term investors as okay, but viewed it to be much more uncertain in the short-term.

Mr. DeClark next considered occupancy statistics for assisted living facilities in general, and the debtor's property in particular. Overall, senior living occupancy rates increased nationally from 83.1% in the first quarter of 2023 to 84.4% in the third quarter. On a property-specific level, DeClark reviewed the historical occupancy rates at the Mayville facility from November 2021 through November 2023. According to his report, "[o]verall occupancy has increased from an average 27.6 residents, or 74.6% occupied, in 2021 and 2022 to 29.5 residents, or 79.8% occupied in fiscal year 2023." And according to the facility's November 2023 rent roll, there were 33 residents, or an 89.19% occupancy rate, with 26 private pay residents (78.78% of occupants) compared to seven pubic pay (Inclusa/Medicaid) residents (21.21% of occupants). The average occupancy rate over the period of November 2021 through November 2023 was 77.29%, with the largest chunk of vacancies occurring in 2022.

### 2.  Valuation Opinion

Mr. DeClark, like the bank's expert James Tellatin, used three different statistical methods of analysis to reach his ultimate valuation conclusion: the cost approach, the sales comparison approach, and the income capitalization approach. Ultimately, both experts considered the income capitalization

approach to be most reliable given the purpose of the valuation and viewed the sales comparison approach as a secondary consideration. The Court describes below how each appraiser calculated value under the several approaches.

### a. Cost Approach

For the cost approach, Mr. DeClark estimated the value of the land, plus the current depreciated replacement or reproduction cost of the building and improvements, and an estimated entrepreneurial incentive[1].

First, he arrived at a land value by comparing five nearby land sales, and adjusting for differences like location, size, and shape. This led him to conclude that a fair market value for the land is $20,000 per acre, rounded to $130,000 for the entire parcel.

Second, he calculated the direct and indirect building and site improvement costs. Components of this calculation include:

- A direct building cost, based on data from the Marshall Valuation Service (a nationally recognized provider of building cost data commonly used in the valuation profession), to which he made minor refinements, reaching a sum of $5,723,021.

- A cost for direct site improvements, which includes costs for landscaping and the parking lot, totaling $367,500.

- Indirect costs—which include things like professional fees—amounting to $304,526.

Altogether, the direct and indirect costs for the building and site improvements totaled $6,395,047. Mr. DeClark then compared that number to the property developer's 2017–2018 budget, which was a little over $7 million, and arrived at a current estimate of $6,500,000. To this, DeClark added an entrepreneurial

---

[1] As the bank's appraisal report describes, an entrepreneurial incentive is "a necessary cost to compensate the entrepreneur for the financial risks, over and above the developer's fee or costs. The incentive or profit is the inducement for the developer/ownership to risk their capital, which often includes personal assets in loan guarantees, etc. [It] refers to the amount that the market would recognize the developer is entitled to receive as compensation for providing coordination and expertise and for assuming development risks." ECF No. 116, at 112.

incentive of 8% of the value of the land and building, or $530,400, for a total replacement cost of $7,030,400.

Against that total cost, DeClark then calculated physical depreciation costs of 13% based on an effective building age of six years and an economic life of 45 years, resulting in a deduction of $937,387.

DeClark next calculated a depreciation amount for "external obsolescence," which he described as anything that may affect the property value outside the four corners of the property itself, such as issues of supply and demand, the overall market, and unforeseen scenarios. DeClark looked at several factors:

- First, he reported a general historical trend of an increasing percentage of public pay residents at the Mayville facility. The occupancy rate of the public pay residents over the 12 months prior to his analysis averaged 17.5% of the resident census; this growth in the public-pay component signals a potential reduction in overall revenue.

- In addition, while there may be an increase in current demand due to the aging Baby Boomer population, in light of the changes in CPI and interest rates, the actual degree of change in demand is uncertain.

- Somewhat related to the prior factor, the age of the new residents upon entry at the Mayville facility is increasing, which typically translates to higher initial costs for these new residents.

To calculate the proper amount of external depreciation or "obsolescence," DeClark took the estimated cost of the building and land ($7,160,400), and deducted his physical depreciation calculation ($937,387), to arrive at a depreciated cost estimate of $6,223,013. He then applied a capitalization rate of 10% to come up with the amount of income needed to make the debtor a feasible entity, or "cost feasible net operating income," which was $622,301. When compared to his calculation of stabilized net operating income of $255,006 (to be described later), the difference was $367,295. Again applying a 10% capitalization rate, that led to an external obsolescence deduction of $3,672,953.

When adding the value of the land and building and then deducting amounts for depreciation, DeClark reached a conclusion of value per the cost approach of $2,550,000.

### b. Sales Comparison Approach

Under the sales comparison approach, value is estimated by looking at recent sales and/or listings of comparable properties in the market, and then adjusting for transactional differences, market conditions, and physical characteristics.

Mr. DeClark looked at the sales of six properties in Wisconsin. He considered it important to use in-state comparable sales, because Wisconsin has its own set of rules and regulations for these types of facilities, and properties in other states might not necessarily meet the same requirements and needs.[2] Narrowing his geographical area even further, DeClark tried to focus on properties in the area between Madison, Milwaukee, and Fond du Lac. There are no other comparable assisted living facilities in Mayville.

The six sales he chose were in Randolph, Beaver Dam, Madison, Kimberly, and Rio. Their average year of construction was 2000. He then compared those properties to the Mayville facility and made upward or downward adjustments to account for differences in location, size, age, construction quality, design/functional utility, land-to-building ratio, and occupancy. DeClark conducted a quantitative analysis, rather than a qualitative one, meaning his property adjustments were expressed quantitatively as percentages or dollar amounts. In this type of analysis, he finds it important to keep the adjustments as limited as possible, because that shows that the properties are, in fact, comparable.

---

[2] Other state-specific factors can be, for instance, whether, and at what amount, the state has implemented a minimum wage. *See, e.g.*, Louis E. Robichaux IV & Russell A. Perry, *What's Happening with Long Term Care Skilled Nursing Providers? Headwinds, Headaches and Help Wanted!*, 33 Am. Bankr. Inst. J., July 2017, at 64 and n.23 (citing Kourtney Liepelt, "Minimum Wage Hikes to Have Ripple Effect in Senior Living," *Senior Housing News* (April 18, 2016), *available at* seniorhousingnews.com/2016/04/18/minimum-wage-hikes-ripple-effect-senior-living.).

The largest adjustment DeClark made was to his second comparable sale, in Madison, which he adjusted downward by 20%. To him, his low level of adjustment reflected that he chose a good set of comparable sales. If, for example, he had needed to adjust a property value by 50%, that would mean the sale was not actually comparable.

The first sale, in Randolph, was the most recent—in June 2023. DeClark's net adjustment to that property was 3%. The second property, the Charleston House in Beaver Dam, was the closest in proximity to Mayville and sold in February 2023. DeClark's net adjustment to that property was 18%. This was the only comparable property that DeClark visited. He testified that he found it to be very comparable to the Mayville facility, and was surprised at its good condition.

Sales 3 and 5 had the highest sale price per unit. Sale 3 was in Madison, and sale 5 was in Kimberly (the Appleton-Oshkosh metro area), areas significantly more populated than Mayville. DeClark considered this relevant because cities with a larger population base have more disposable income. In analyzing the comparable sales to estimate a value for the Mayville facility, DeClark gave more weight to the first two and most recent sales. Applying the sales comparison approach, DeClark's conclusion of value for the Mayville facility was $2,590,000, or $70,000 per unit.

### c. Income Capitalization Approach

The income capitalization approach estimates value through the capitalization of anticipated future income. This approach involves examining revenue of the property from an actual standpoint and a market standpoint, then offsetting that revenue by vacancy and collection loss issues as well as operating expenses, to generate net operating income, or NOI. A capitalization rate then is applied to that NOI to yield an expected value of the property.

Mr. DeClark first calculated potential gross rental income for the Mayville facility. At the time of his report, 33 of the 37 units were occupied, with an average contract rent rate per unit (at least for the "private pay" residents) of

$5,618. When annualized, full potential rent for the occupied units, at a private pay rate, was $2,224,728. To that, DeClark added market rent for the four vacant units based on a market rent rate of $5,600, which totaled $268,800 on an annual basis. This equated to potential gross rental income of $2,493,528. DeClark then considered "other income" attributable to units with a second occupant, estimated to be $37,000 per year. Together with the rental income, this resulted in Potential Gross Income, or PGI, of $2,530,528.

Next, Mr. DeClark applied a 20% (physical) vacancy rate, and a 10% economic vacancy rate, to reduce the PGI by 30%. To arrive at his 20% vacancy rate, DeClark relied on the average historical vacancy rate for a two-year period—November 2021 through November 2023. The actual vacancy rate was 22.7%, which he rounded down to 20%. In this respect, DeClark used a backward-looking approach, putting more weight on historical averages—including data from the latter half of 2022, when the average vacancy rate was at a high of 32.4%—rather than the current vacancy rate of 10.8% (4 units).

For the 10% "economic vacancy" rate, Mr. DeClark compared the differential between public pay rates and private pay rates. As noted above, the market/private pay rate for the units was $5,600/month, but, according to DeClark, the historic public pay rate was $3,462. The difference is $2,138 per month, or an annual loss of $25,656 per public pay unit. DeClark described this revenue gap as an "economic vacancy"—to be distinguished from a true, physical, vacancy—reflecting that public pay residents generate less income for the facility (as compared to private pay residents), without a concomitant reduction in expenses. DeClark therefore calculated an amount to account for the projected "public pay" revenue loss, to subtract from his prior calculation of potential revenue. To do so, he multiplied the annual public-pay unit loss ($25,656) by seven, the current number of public pay occupants, for a total rent loss of about $180,000 per year. When divided by potential gross income of a little over $2.5 million, that generates an implied vacancy of 7.2%. DeClark rounded this up to 10%, recognizing that he rounded down the actual vacancy percentage, and because he believes it is very likely that public pay occupancy

will increase in the near term, based on recent trends and the increasing age of new residents.

Unlike his approach in calculating the physical vacancy rate, DeClark's focus in arriving at an economic vacancy rate was more forward-looking; rather than use the average historical public pay occupancy rate from November 2021 through November 2023 (which was only 4.44 residents), he relied on the current number of seven. There was no evidence to dispute DeClark's prediction that the ratio of public pay residents at the Mayville facility will increase—and even the bank's expert acknowledged the existence of what he calls "private pay attrition," which he accounted for in his projected future public pay ratio, at a rate similar to that of Mr. DeClark.

After subtracting 20% of PGI to account for overall rental vacancies at the private pay rate ($506,106) and another 10% of PGI to account for "economic vacancy" due to the lower public pay rate ($253,053), DeClark arrived at an "Effective Gross Income" of $1,771,369.

For his expense analysis, Mr. DeClark first looked at the facility's actual operating expenses for 2021, 2022, and annualized for 2023. Then, he looked at expenses of similar properties to see how the Mayville facility compared to the market, and to support or refute what its expenses have been, and what they could be. That comparison led DeClark to conclude that the property's historical expenses were reasonable. Based on this assessment, he calculated Mayville's annual operating expenses to be $1,516,363. After subtracting these expenses from his prior calculation of Effective Gross Income, DeClark reached a Stabilized Net Operating Income (NOI) of $255,006.

The next step in the income capitalization process is to apply a capitalization rate to transform the income into a value. DeClark explained that the capitalization rate can come from various sources. He looked at three of them:

- The first was a group of market comparables, from sales of senior living facilities that took place in Wisconsin between October 2020 and May 2022, with capitalization rates ranging from 7.42% to 9.62%.

- The second source was a collection of investor surveys from the first quarter of 2023, with an average capitalization rate of 8.14%.

- The third source was the "Band of Investment" technique, which essentially calculates what kind of equity return is demanded in the market, and suggested a capitalization rate of 10.14%.

Mr. DeClark then considered several factors that pointed to increased risk with the Mayville property, such as increasing vacancy, its more rural setting, and a local market that has a reduced population and reduced income. He concluded that 10% was an appropriate capitalization rate. When multiplied by his calculated NOI, that resulted in a value of $2,550,000 under the income capitalization approach.

### d.     Reconciliation

To reach his final opinion on value, Mr. DeClark considered and weighed the results of his three different methodologies. For this particular market, he found the cost approach to be the least reliable, and he gave the greatest weight to the income capitalization approach. This led to his ultimate conclusion of value of $2,550,000.

## B.     Testimony of James Tellatin

The bank presented expert reports and testimony from James Tellatin. Mr. Tellatin is the Senior Managing Director of the Healthcare and Senior Housing Specialty Practice Group of Integra Realty Resources in Chesterfield, MO. He is a licensed appraiser in Wisconsin.

Mr. Tellatin been an appraiser for over 40 years, focusing primarily on healthcare properties across the U.S. He has appraised over 10,000 nursing homes, assisted living facilities and hospitals in every state in the U.S., plus the District of Columbia, Puerto Rico, and Canada.

Tellatin described himself as having unique qualifications because he has owned, developed, operated, borrowed, leased, and sold more than $100 million of senior housing properties that he co-developed with a couple of former appraisers. He also remarked that he "wrote the book" on appraising senior housing and nursing homes, twice. He authored "The Appraisal of

Nursing Facilities" at the request of the Appraisal Institute, which was published in 2009. And he was the lead author of a book on the appraisal of senior housing, nursing homes and hospitals, which was published by the Appraisal Institute in 2023. He has testified at various trial levels about senior housing and hospital properties in over 20 states.

Mr. Tellatin co-produced his valuation report with Bradley Schopp. Mr. Schopp visited the Mayville property and performed additional research on sales and market data. Tellatin prepared his report in accordance with the same standards and guidelines as did Mr. DeClark.

The Court finds Mr. Tellatin to be well-credentialed, experienced, and qualified to opine on the value of the Mayville facility.

Notably, this is not the first time Mr. Tellatin has conducted an appraisal of the Mayville property. He first appraised it in July 2020, about two years after it opened, and estimated the "as is" market value of the property at the time to be $5,930,000. At the same time, he opined that the "disposition value" of the property was $4,450,000.[3] He conducted a second appraisal for Old National Bank in October 2022. At that time, he estimated the "as is" market value of the property to be $6,390,000, and the prospective "as stabilized" value on November 1, 2023, to be $7,470,000. The stated purpose of all three appraisals was "periodic evaluation."

In the appraisal Mr. Tellatin conducted after the debtor filed its Chapter 11 case, his overall value conclusion for the property, as of November 21, 2023, was $6,080,000.

### 1. Market Analysis

In reporting his current value conclusion, Mr. Tellatin started out looking at the "big picture," funneling down from national, to regional, and then to local factors that may affect the value of the property.

---

[3] In his 2020 appraisal, Mr. Tellatin noted the outbreak of the Novel Coronavirus (COVID-19) and declaration of worldwide pandemic. His report also stated that "A prolonged outbreak could have a significant (and yet unquantifiable) impact on other real estate sectors" and so recommended a more frequent review of this valuation. ECF No. 123, at 3–4.

For the "big picture" analysis, Tellatin considered national trends in demographics and population, keying in on the senior population aged 75 and older, to get an idea of future supply and demand. He also looked at labor markets, because labor represents a substantial portion of the operating expense for these types of properties, as well as interest rates and the cost of alternative investments.

In his regional analysis, Mr. Tellatin focused on Dodge County, which he described as a rural community with a lot of manufacturing and some agriculture, and is a smaller market than average for the typical senior housing property. Tellatin concluded that while the population of Dodge County itself is going to be relatively flat over the next five years, the over-75 population will increase annually by 3.29%, which correlates with the general demand trends for assisted living. All things being equal, he anticipates a demand increase of about 3% per year for senior living facilities.

On the supply side, Tellatin looked at competitors in all directions from Mayville, and factors such as their occupancy rates, rental rates, waiver/Medicaid (public pay) census mix, relative location qualities and neighborhoods, and physical units. He concluded that supply will be stable, but demand will grow, at least while the Baby Boomer generation continues to age. Tellatin believes that this forecast will hold true both nationally and locally.

Mr. Tellatin next considered the occupancy rate of the Mayville property. He observed that the property did a "good job" of absorbing residents when it opened in 2018 and 2019, and then occupancy seemed to drop in tandem with the pandemic. According to Tellatin, in the industry as a whole, occupancy rates dropped about 10% during the pandemic, then rebounded to normal levels. The Mayville property occupancy rate went from 64.9% in 2021 to 71.6% in 2022, and in the first nine months of 2023, it increased to 80.5%. Tellatin described this increase as being consistent with the industry overall. He projected that the occupancy rate at the Mayville facility over the next six years

will increase and remain within a range of 88% and 93.2%, between November 2024 and November 2029.

### 2. Valuation Opinion

Mr. Tellatin valued the property using the same three approaches as DeClark: the cost approach, the sales comparison approach, and the income capitalization approach, but reached different conclusions.

### a. Cost Approach

Under the cost approach, Tellatin first estimated the value of the land, based on comparable sales in the area, as $225,000.

Next, he calculated the direct and indirect building and site improvement costs. Using the Marshall Valuation Service, as did DeClark, he estimated direct building costs of $5,318,190, direct improvement costs of $451,000 and direct costs for tangible personal property of $333,000. To that he added indirect costs including a developer fee, cost of absorption/stabilization, and an entrepreneurial incentive, for a total building cost of $7,186,736, total site improvement cost of $609,459, and total tangible personal property cost of $450,000. From there, he applied deductions for physical depreciation, altogether totaling $1,068,133.[4] This resulted in a total building/site improvement value (rounded) of $6,880,000, and tangible personal property value of $300,000. When added to the value of the land, Tellatin's estimate of the property under the cost approach was $7,405,000.

### b. Sales Comparison Approach

Under the sales comparison approach, Tellatin looked at the sales of five other senior housing properties—two in Michigan (the Grand Rapids and Kalamazoo areas), and three in Wisconsin (Beaver Dam, Appleton, and

---

[4] Tellatin calculated depreciation of the building itself at a rate of 10%, based on an effective building age of five years and an economic life of 50 years, and depreciation of the site improvements and tangible personal property at a rate of 33.33%, based on an effective age of five years and average remaining life of 15 years. In contrast to DeClark, Tellatin did not factor in any deductions for external obsolescence, explaining: "The subject is well located and should be able to maintain a profitable occupancy level; neighborhood and regional factors affected by social, economic, and political forces should continue to be favorable. Thus, no external obsolescence is evident." ECF No. 116, at 118.

Westfield). He chose these properties because he was familiar with the sales and had appraised several of the properties for financing purposes. He considered being knowledgeable about a sale to be more important than the proximity of the location, at least to the extent that the appraiser may have incomplete information about the closer sale. On that aspect, he criticized Mr. DeClark's reliance on one "comparable" sale in which there was only one private-pay resident, saying that just because a location is closer doesn't mean it would be seen as comparable economically by buyers/investors. (Notably, all of Tellatin's comparable sales were reportedly 100% private pay, while his projections for the Mayville facility through 2029 estimate a private pay rate of only 74.7%.)

After reviewing the data on the five properties he selected, Tellatin compared factors like location, age, private pay mix, occupancy rate, building area per unit, and expense margin and NOI per unit. He made a qualitative, rather than quantitative assessment. In other words, he described the elements of the other properties as comparable, superior, or inferior to the Mayville property, to place the per-unit price of the other properties into a value range for the subject property.

Tellatin concluded that the Mayville property was superior to the other properties he chose, on average, in a number of ways. For example, the average construction year of the comparable properties was 2007, while the Mayville property was constructed in 2018. The average gross building area per unit of the other properties was 613 square feet, while the Mayville property's per-unit area is 1,063 square feet. And the average occupancy rate at the other facilities was 82.5%, while he estimated that the Mayville property's occupancy (projected for 2024) would be 88%. On the other hand, he found the Mayville property to be inferior in some respects. Notably, while the comparable sales he used were all 100% private-pay residents, he estimated the Mayville facility to have only 75% of private pay residents.

The average sale price of the other five properties, all private pay units, was $127,369 per unit. Tellatin concluded that the appropriate value of the

Mayville property was $170,000 per unit, citing the fact that it is newer, larger, and has a higher (projected) occupancy rate. His ultimate value conclusion under the sales approach was $6,300,000.

### c. Income Capitalization Approach

Mr. Tellatin, like Mr. DeClark, described the income capitalization approach as the most appropriate in valuing an assisted living facility. Although he and DeClark employed the same methodology, they came to drastically different results because of their use of different inputs.

According to Mr. Tellatin, the key differences between the values and inputs used by the two appraisers were occupancy rate (80% vs. 88%), capitalization rate (10% vs. 8%), and percentage of NOI as gross revenue (25% vs. 15%). Tellatin considered his own approach to be more accurate, because he was "looking down the road" and asking what the market will do, rather than looking in the rearview mirror based on occupancy rates during the pandemic.

Tellatin first calculated effective gross income for the Mayville facility. Using a forecasted census mix of 29 private pay residents (paying monthly rent of approximately $5,000) and eight public pay residents (paying monthly rent of approximately $3,500), he projected total potential rental revenue of $2,076,739. He then reduced this amount based on an 88% occupancy rate, for effective renal income of $1,826,515. To this, he added annual income from second occupants ($35,885) and miscellaneous revenue for ancillary charges like additional laundry/housekeeping, parking, activities, etc. ($41,686), for total effective gross revenue of $1,904,087. From this, he deducted projected expenses of $1,425,985, for an estimated NOI of $478,102.

After calculating NOI, Tellatin then applied a capitalization rate to turn this projected income into a property value. To determine the appropriate capitalization rate, Tellatin used the same methods and sources as did DeClark, but came to a different conclusion. The capitalization rate for the sales of the five properties Tellatin used in his sales comparison analysis

ranged from 7.1% to 9.5%, with a weighted average of 8.4%. Based on investor surveys from 2022, the spread of capitalization rates for assisted living facilities ranged from a high of 8.7% to a low of 6.0%, with an average of 7.5%—although Tellatin believed this data to be unreliable, and considered it useful only to the extent that it "show[ed] general trends." *See* ECF No. 116, at 162–63. And when relying on the "band of investment" technique, Tellatin arrived at a rate of 8.36%. Because the Mayville property is newer than all the comparable sales he used (and also newer than those DeClark used), Tellatin chose a lower capitalization rate of 8%.

When applying his 8% rate to his estimated NOI of $478,102, Tellatin arrived at a rounded value estimate of $6,000,000 under the direct income capitalization approach.

### d.    Reconciliation

To reach his final opinion on value, Tellatin said that he placed the majority of weight on the income capitalization approach, gave no weight to the cost approach, and gave secondary weight to the sales comparison approach, because that's what the market would do. His ultimate conclusion of value was $6,080,000.

## C.    Testimony of Pamela Mainz

Pamela Mainz is the Director of Admissions and Marketing for the Mayville facility. She's held this role for six years, since the opening of the facility. Her responsibilities include going to nursing homes, rehab facilities, and hospitals to try to obtain new residents; performing assessments to determine the level of care needed by new residents; collecting all the paperwork required by state regulations to bring in a new resident; and working with residents' families. She performs the same duties at the Prairie Ridge Assisted Living Facilities in Beaver Dam and Waupun. She is a licensed administrator with the Wisconsin Assisted Living Association.

Ms. Mainz is familiar with the number of vacancies at the Mayville facility and prepared a document showing the facility's rent roll for every month from

November 2023 (the date of the two appraisals) through May 2024. The roll reflects the following breakdown of vacancies and private pay vs. public pay residents:

- November 2023: 3 vacancies; 7 public pay residents
- December 2023: 1 vacancy; 7 public pay residents
- January 2024: 2 vacancies; 6 public pay residents
- February 2024: 4 vacancies; 6 public pay residents
- March 2024: 3 vacancies; 6 public pay residents
- April 2024: 7 vacancies; 6 public pay residents
- May 2024: 12 vacancies; 6 public pay residents

Ms. Mainz said that the occupancy of the facility ebbs and flows, and that there are no predictable trends, nor does she anticipate this tendency for fluctuating occupancy levels to change in the near future. She has observed a trend in increasing ages of new residents, attributing it to the fact that people are staying home longer with the help of family. She added that, in the small farming community of Mayville, people are reluctant to sell their homes and farms. In her experience, most people living in Mayville cannot be persuaded to go to the related facilities in either Beaver Dam or Waupun, because they want to be close to their family and/or their Power Of Attorney. In other words, when they are ready, they would enter the Mayville facility.

Ms. Mainz disputed Mr. Tellatin's description in his report of the Charleston House facility in Beaver Dam as being "vastly inferior" to the Mayville property. She described that facility as elegant and quaint, with the added draw of being on a lake. She also considered Mr. Tellatin's forecasted occupancy rate of 88% for the Mayville property to be unreasonable, as it was contrary to her experience. She observed that one month she might have three vacancies, and then the next month, 12. Vacancies arise due to the deaths of residents, and no one can predict the timing of those events (for any particular individual).

## ANALYSIS

The Court's inquiry here is governed by 11 U.S.C. section 506(a), which provides, in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).

Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure allocate the burden of proof for valuing secured claims under § 506(a), and courts therefore have adopted different formulations. In *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012), the Third Circuit identified three possible approaches, variously placing the burden on the secured creditor or the party seeking to value the claim. *See id.* at 139–40 (collecting cases). The *Heritage* court ultimately adopted a burden-shifting framework, placing the initial burden on the party challenging the secured claim (there, the debtor) to present evidence sufficient "to overcome the presumed validity and amount of the creditor's secured claim," which, once met, shifts the ultimate burden of persuasion to the creditor "to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim." *Heritage Highgate*, 679 F.3d at 140 (quoting *In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992)) (internal quotation marks omitted). In the absence of explicit authority to the contrary, the Court finds this approach to be the most reasonable in the circumstances.

The Code is likewise silent on the appropriate date for valuing property in a Chapter 11 case. Where the purpose of the valuation is to determine the proper treatment of a creditor's claim in a Chapter 11 plan—the goal of the debtor's claim objection here—most courts generally try to value the property

as of the confirmation date or effective date of the plan. *See, e.g.*, *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 530 (5th Cir. 2018) (citing cases).

Neither party has urged the Court to determine the value of the property as of a specific date. Both experts testified to the value of the property as of November 2023, and there was no evidence or argument that these values would not obtain on the effective date of the debtor's forthcoming plan, notwithstanding some more recent figures from the "rent roll" introduced by Ms. Mainz. The Court therefore will rely on the opinions of value as of November 2023 in assessing value for purposes of treating the bank's claim in a Chapter 11 plan.

As for the appropriate valuation methodology, our Supreme Court counseled in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997), that the "debtor's 'use' of the property" is "[o]f prime significance," and the "actual use" of the property rather than a "foreclosure sale that will not take place" should guide the Court's valuation. Here, the debtor intends to continue operating the property as an assisted living facility. Both experts agreed that the "highest and best" use of the property is to continue doing so, and, for that reason, gave the most weight to the "Income Capitalization" approach in valuing the property. Bankruptcy courts routinely do the same when the debtor proposes to retain and use collateral to generate income with which to make payments to creditors. *See, e.g., Heritage Highgate*, 679 F.3d at 141–42. Both experts gave secondary consideration to their comparable sales approach.

It may be an understatement to say that valuation of commercial property is not an exact science. As one bankruptcy court has observed, judges, who are not experts in the subject,

> have struggled to identify a rational rule of decision when confronted with competing appraisals that often reflect widely divergent opinions of value. Some courts pick and choose between the metrics used by each appraiser, effectively recomputing the valuation formula using their preferred metrics as the inputs. Other courts adopt the value set forth in the appraisal that they find more persuasive, rejecting the competing appraisal entirely.

> Other courts evaluate each appraisal on its merits in order to determine how much relative weight to accord each opinion of value, usually ending up with a value figure somewhere in the middle.

*In re EM Lodgings, LLC*, 580 B.R. 803, 808–09 (Bankr. C.D. Ill. 2018) (internal citations omitted).

In *EM Lodgings*, the bankruptcy court gave primacy to the third approach.[5] Both expert witnesses in that case were well-qualified and competent and had used the same accepted methodology but reached divergent value conclusions based on "dramatically different views" about the future performance of the debtor-hotel. As the court explained, one expert was "relatively pessimistic," while the other was "more optimistic," particularly when projecting the debtor's hotel occupancy rates and net operating income over the next 10 years. 580 B.R. at 811.

The *EM Lodgings* court found "no evidentiary basis . . . to determine which set of projections is more valid or 'correct,'" because the appraisers were "simply guessing about what the future holds." *Id.* Highlighting the uncertainty inherent in the appraisal process, the court pointed to the experts' own prior appraisals, reflecting that their value opinions had changed over time. The court emphasized:

> A competent appraiser is simply attempting to replicate the analytical process that market participants, buyers and investors, would engage in at a particular point in time, using the best data then available. The fact that actual future performance of a given hotel varies widely from that predicted in an appraisal, ordinarily says very little about the validity of the appraisal or the competency of the appraiser.

*Id.*

Because, in the *EM Lodgings* court's estimate, market participants were just as likely to find one expert's projections as credible as the other's based on

---

[5] The *EM Lodgings* court heard valuation evidence in the course of a hearing on a lender's motion for relief from stay. The debtor had stated its intention to sell the hotel property, although it had failed to file a Chapter 11 plan for almost five months past the extended exclusivity period.

the available data, the court weighted the appraisals equally, and chose an average of the two experts' valuations. 580 B.R. at 812.

This case bears several parallels to the *EM Lodgings* case. Mr. DeClark and Mr. Tellatin are similarly qualified, experienced, and competent appraisers whose work meets industry standards. They used the same accepted methodologies but reached vastly different value conclusions. According to Mr. DeClark, this disparity is attributable in large part to the way in which each expert viewed the senior housing market. While Mr. Tellatin took a more "global" look at senior housing trends—and, for example, considered comparable sales in other states and much larger metropolitan areas—DeClark emphasized that Mayville is a small community, with a decreasing population,[6] below-average housing prices, and a greater variance between public and private pay residents, with the percentage of public pay residents increasing. Mr. Tellatin's more optimistic outlook on occupancy rates results in a greater forecasted NOI, and therefore a higher valuation using the income capitalization approach.

Without casting the Court as the third appraiser, there is some room for doubt as to several of the bases or components of each expert's conclusion that reasonably warrant some adjustment. In short, the Court considers whether the bank has met its ultimate burden of persuasion, after the debtor met its initial burden by supplying a competent appraisal valuing the claim below its presumptively valid amount. *Heritage Highgate*, 679 F.3d at 140.

For example, Mr. Tellatin's "global" approach, at least in part, seems to ignore or discount the unique characteristics of the Mayville community likely to affect demand/profitability. Ms. Mainz credibly testified that potential assisted living residents want to remain close to family and POAs. While the

---

[6] Both appraisers considered a population projection out five years, or to 2028. While no express reason was given for projecting five instead of ten years, for example, potential investors may well consider census data, and note that the relative population age "bulge" of those over 65 years will have started to slow by 2030. "The Older Population: 2020," U.S. Census Bureau (May 25, 2023), *available at* census.gov/library/publications/2023/decennial/c2020br-07.html

75+ population in Mayville is expected to increase, the younger population is forecast to decrease; a greater objective demand does not necessarily mean increased residents at the Mayville facility. Mr. Tellatin's expectation of a 3% demand increase, and therefore increased occupancy at the Mayville facility, seems not to adequately consider increasing interest rates and uncertainty in the local market, more of the senior population opting to stay home longer with the help of family, and local staffing difficulties. Although Tellatin's projection looked forward to a five-year period, the rent roll data from the months between his November 2023 report and the May 2024 hearing was not as robust. Tellatin's excess optimism was further evident in his decision not to factor in a deduction for external obsolescence in his cost approach calculation.

Debtor's counsel urged discounting of Mr. Tellatin's conclusions because the Mayville facility has failed to achieve the occupancy levels Tellatin previously forecast. For example, in July 2020, Tellatin projected that the occupancy rate in June 2021 (averaged over the prior year) would be 89.6%, while the *actual* annual occupancy rates, as of December 2020 and December 2021, were 86.5% and 64.9%, respectively. Tellatin also projected a June 2022 occupancy rate of 91.8%, while the actual rate in September 2022 was 64.3%. And he projected a June 2023 occupancy rate of 94.1%, while the actual rates as of December 2022, and annualized through September 2023, were 71.6% and 80.5%, respectively. As did the court in *In re EM Lodgings*, this Court does not find that changed calculations over a series of appraisals in a 3.5-year span necessarily impugns the most recent projections.[7]

But the Court does consider another difference between Mr. Tellatin's approach and that of Mr. DeClark—his inclusion of comparable sales outside the state of Wisconsin. While the sales approach admittedly is secondary for both appraisers, Mr. Tellatin's calculations overlook that certain state- or locality-specific characteristics may have an effect on valuation—such as state

---

[7] The *EM Lodgings* court found the "uncertainty inherent in the discounted cash flow methodology and the appraisal process generally" to be exemplified by changing valuations, such as Mr. Tellatin's serial appraisals. 580 B.R. 803, at 811.

regulations for assisted living facilities, differences in the local labor market such as staffing difficulties or increased expenses, or the fact that some of his national data may include other state-specific factors like minimum wage rates. Ms. Mainz's credible evidence that Mayville facility residents tend to come from local households—because they can be nearer to their own families—is compelling testimony that local and regional data should be given a greater weight. A milder flaw in the Tellatin comparable sales analysis is his discounting of the Charleston House facility—a facility which Ms. Mainz has visited in her professional capacity, and one which she, as a director of admissions and marketing, deemed quite desirable.

Similarly, the Court cannot take Mr. DeClark's conclusions without some adjustment. For example, in his report Mr. DeClark seemed to alternate between using "historical" numbers and current statistics, but without explaining the switch. He used historical vacancies going back to 2021 when the market was still recovering from COVID, inputs which may have skewed his future occupancy projections downward. Elsewhere in his report, he acknowledged that the occupancy rate of the facility has been increasing since 2021, but it is not clear he gave appropriate weight to this more recent data in projecting a future vacancy rate. At the same time, he relied on the current public pay ratio, rather than the historical two-year average, to calculate his future "economic vacancy" rate.

Mr. Tellatin was critical of DeClark's comparable sales approach for not considering (or obtaining) enough data about each sale.[8] DeClark seemed to explain this difference by saying his analysis was quantitative, not qualitative. Nonetheless, while both methods may be valid, the Tellatin qualitative approach appears more comprehensive, and therefore more valuable to

---

[8] Tellatin also pointed out that DeClark did not rely on these sales in calculating his capitalization rate under the income capitalization approach, and instead used a different group of market comparables. While it is possible that DeClark did not have sufficient data from the "sales comparison" properties to use them in calculating a capitalization rate, the variation was not explained.

potential investors. In addition, Tellatin used more recently built facilities. Accordingly, DeClark's comparable sales conclusion will not be credited fully.

One of the greatest areas of disparity between Mr. DeClark's conclusion and Mr. Tellatin's conclusion is that DeClark used a 10% capitalization rate in his primary approach. To arrive at that rate, DeClark considered several "risk" factors, one of which included his projection of increasing vacancy. Yet it is reasonable to accept that this "risk" can be discounted in part, due to the undisputed recent higher occupancy rates to which Ms. Mainz testified. Moreover, the capitalization rate that DeClark chose was higher than what both his "market comparables" and survey responses suggested, and higher than all of Tellatin's suggested rates.

In sum, both appraisals were derived from accepted and competent appraisal methods, even though the two experts reached substantially different conclusions. In light of their credentials, and the degree of data support each offered for their conclusions, it would not be appropriate for the Court simply to credit the valuation of one appraisal and wholly discount the other, as some courts have done. *See, e.g., In re Mt. Laurel Lodging Associates, LLP*, No. 13-11697-RLM-11, 2014 WL 1576971 (Bankr. S.D. Ind. Apr. 18, 2014). Instead, given the thoroughness of the two reports, yet mindful of some weaknesses (such as too great a reliance on national statistics, or a lesser amount of sales data, and the other points mentioned above), the Court finds it appropriate to follow courts like *EM Lodging* and *In re 210 Ludlow Street Corp.*, 455 B.R. 443 (Bankr. W.D. Pa. 2011), and reach a valuation number somewhere in between. Averaging the two different valuation conclusions, instead of assigning a dollar value to each critique, is a fact-finder's way to account for undue optimism in one report and undue pessimism in the other, without credentialing the Court as a third appraiser.

Therefore, the Court finds that $4,315,000 is an appropriate valuation of the debtor's property for its proposed use and is the sum that the debtor can use as the secured value of the bank's claim.

**CONCLUSION AND ORDER**

For the foregoing reasons,

IT IS ORDERED that the debtor's objection to Old National Bank's claim is sustained in part, consistent with this decision. The bank's claim shall be treated as secured in the amount of $4,315,000, with the remainder of the claim being unsecured.

Dated: June 4, 2024

By the Court:

Beth E. Hanan
United States Bankruptcy Judge